## IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

| | |
|---|---|
| ROBERT ANTHONY LAY<br>c/o The VerStandig Law Firm, LLC<br>9812 Falls Road, #114-160<br>Potomac, Maryland 20854<br><br>    Plaintiff,<br><br>v.<br><br>CAESARS ENTERTAINMENT CORPORATION<br>One Caesars Palace Drive<br>Las Vegas, Nevada 89109<br><br>Serve: CSC Services of Nevada, Inc.<br>112 North Curry Street<br>Carson City, Nevada 89703<br><br>    Defendant. | Case No.: _____ |

### COMPLAINT AND DEMAND FOR TRIAL BY JURY

Comes now Robert Anthony Lay ("Mr. Lay" or the "Plaintiff"), by and through undersigned counsel, and as and for his complaint (the "Complaint") against Caesars Entertainment Corporation ("Caesars" or the "Defendant") states as follows:

### Introduction

1. This matter concerns the operation of a so-called "bait and switch" by a prominent casino operator to the detriment of Mr. Lay, a consumer card player.

2. Specifically, the Defendant promised Mr. Lay he could qualify to partake in a championship poker tournament, at no cost, if he enriched the Defendant through the expenditure of various monies in qualifying poker contests at properties owned or managed by the Defendant (including one in Baltimore, Maryland).

1

3. Mr. Lay not only elected to partake in the Defendant's illusory program but, indeed, saw the Defendant's false promises reinforced throughout, seeing the Defendant publish public updates on his progress toward this sought-after prize.

4. When Mr. Lay finally satisfied the Defendant's qualifying criteria and "won" entry into the championship tournament, the Defendant – for reasons known to the Defendant at all times relevant, and publicly-available at all times relevant – deemed Mr. Lay an undesirable patron, permanently trespassed him from setting foot upon its properties, and revoked the prize for which he had labored – and paid – so handsomely.

**Parties**

5. Mr. Lay is a natural person who is a resident of the State of Oklahoma by virtue of his ongoing domicile therein.

6. Caesars is a Delaware corporation having its primary place of business in Clark County, Nevada.

**Jurisdiction and Venue**

7. This Honorable Court enjoys jurisdiction over Caesars pursuant to Section 6-103(b) of the Courts and Judicial Proceedings Article, as Caesars transacts business in the State of Maryland through its operation of a casino in the State of Maryland and its operation of the World Series of Poker Circuit ("WSOPC") in the State of Maryland, Caesars contracts to supply services in the State of Maryland through its operation of a casino in the State of Maryland and operation of the WSOPC in the State of Maryland, and Caesars caused tortious injury in the State of Maryland through actions inside of – and outside of – the State of Maryland as alleged herein.

8. Venue is properly laid in this Honorable Court pursuant to Section 6-201(a) of the Courts and Judicial Proceedings Article as Caesars carries on a regular business in Baltimore City,

Maryland through its operation of a casino therein and its periodic operation of the WSOPC in said casino.

### General Allegations: World Series of Poker Circuit

9. Caesars is in the business of, *inter alia*, operating the WSOPC, an annual series of poker festivals held at various casinos both within the United States and in other countries throughout the world.

10. Each WSOPC festival consists of a series of poker tournaments held at a singular venue – often over the course of ten (10) to fourteen (14) days – with each venue being considered a "tour stop."

11. A typical WSOPC tour stop will feature more than ten (10) individual poker tournaments, with various rules and various entry fees providing for an eclectic series of games in which members of the public may partake.

12. The WSOPC is one of several poker tours operating throughout the United States.

13. Numerous professional poker players derive an income from participating in tournaments throughout the United States and are known to "go on tour," spending much of their time traveling from one location to another as the various competing poker tours make their respective stops in casinos across the country.

14. During non-summer months, there is no one constant location featuring daily poker tournaments with prize pools large enough to attract the attention of income-seeking professional poker players, so the aforementioned phenomenon of "going on tour" is a necessary means of seeking out games of sufficient size to furnish a reliable income.

15. In an effort to gain a competitive advantage over other poker tours, the WSOPC instituted a year-long promotion where individuals may garner "points" through their

3

participation – and successful collection of proceeds – in WSOPC tour stops throughout the country.

16. Under this year-long promotion, the individuals with the most points at the end of each year are invited to a championship event (the "Global Casino Championship").

17. Individuals invited to the Global Casino Championship have their transportation expenses and entry fee paid for by Caesars.

18. An invitation to participate in the Global Casino Championship has a value in excess of Ten Thousand Dollars and No Cents ($10,000.00) between the entry fee, the transportation expense, and other relevant incentives offered to players.

19. Poker players are able to track their respective progress throughout a given year as a means of determining the probability of their being invited to the Global Casino Championship, and often elect whether or not to continue playing at WSOPC events – as opposed to those featured on other poker tours – based on their relative chances of being invited to the Global Casino Championship.

20. Specifically, the Defendant established a website at http://www.wsop.com/2016/circuit/global-casino-championship/, which advertised, in salient part:

> The Global Casino Championship is an exclusive, invitation-only tournament. There is a minimum prize pool of $1,000,000, and a number of players receive free entries. For each Circuit stop this season, the Main Event winner and the Casino Champion each receive a free seat. In addition, the top 50 players on the season leaderboard (domestic US tour only) earn free entries. With 14 international and 22 US stops, there will be up to 122 free qualifiers.
>
> Players who earn automatic entries will receive accommodations for three nights at Harrah's Cherokee (four for international qualifiers), plus an additional night if they make the final table. They'll also receive a $500 travel stipend.
>
> In addition to the automatic entries, a select group of players has the option to buy in for $10,000 (rake free). The top 100 players on the 2016 WSOP Player of the

4

Year leaderboard has the right to buy in, and any Circuit ring winner from this past season has the option as well.

21.     Specifically, the Defendant promoted to the poker media that the Global Casino Championship would be held, and the terms of qualifying for the event, with Pokernews.com, one of the industry's most widely-read publications, reporting on July 6, 2016, *inter alia*:

> "We are excited to be adding a couple new stops to the domestic tour this year, expanding the international tour and continuing to refine each stop to make them bigger and better," said WSOP Executive Director Ty Stewart in the press release. "We want to continue to provide the opportunity for everyone to take a shot at becoming a World Series of Poker champion."
>
> Everyone has that opportunity because once again, the WSOP Global Casino Championship will crown a WSOP bracelet winner at the end of the circuit season. As in years past, Main Event champions and Casino Champions — players who accumulate the most points in a given stop — will automatically qualify for the WSOP Global Casino Championship. The top 50 points earners overall for the season who don't otherwise qualify will also receive "at-large" qualification for the $1 million prize pool event.

22.     Specifically, in a press release circulated on or about July 5, 2017, the Defendant advertised, *inter alia*:

> Players can qualify for the 2016/17 Global Casino Championship several ways (a.) win a Circuit Main Event at any domestic or international stop (b.) win a "Casino Championship," which is defined as the player at each stop who accumulates the most points throughout the 12-event gold ring schedule at any domestic or international stop (c.) be one of the top 50 cumulative point earners over the entire season who hasn't otherwise qualified (Domestic tour only). Each of these projected 122 players will receive a "free roll" seat into the culminating event.

23.     Specifically, the aforementioned press release advertised that the WSOPC would be making a stop at "Horseshoe Baltimore (Maryland)" on "April 27 – May 8, 2017."

24.     Specifically, a website established by the Defendant (http://www.wsop.com/news/2017/May/9078/WSOP-CIRCUIT-HORSESHOE-BALTIMORE.html), to specifically advertise the WSOPC event in Baltimore, Maryland

5

<mark>Case 2:20-cv-01748-GMN-VCF Document 2 Filed 09/15/20 Page 6 of 18</mark>

(at a property operated by Caesars), boasted on May 1, 2017, *inter alia*:

> As is the case for all stops on the WSOP Circuit, there are two seats to the WSOP Global Casino Championship to be won at Horseshoe Baltimore — one apiece for the Main Event Champion and the Casino Champion. All players who cash in official ring events earn points that also apply toward the season-long race to claim one of the limited at-large bids, as well.

25. The text of the foregoing website has since been overwritten, though such appears to be in the nature of a normative update carried on in the regular course of the business of the Defendant, and no spoliative insinuation is intended herein.

26. Specifically, on March 1, 2017, the Twitter handle "@WSOP" – which is controlled by the Defendant – announced:



27. The article linked to on the foregoing Tweet proclaims, *inter alia*:

6

For both the domestic and International WSOP Circuit, the Main Event winner at each stop of the 2016-2017 season receives a free entry, as does the Casino Champion at each stop. In addition, the top 50 season-long point earners on the domestic WSOP Circuit earn an automatic entry. Last season, the bubble for earning a season-long automatic entry was 125 points. It is expected to be higher this season since there are three more stops on the domestic Circuit than last season.

28. One May 19, 2017, the Defendant even reported, on its website, about Mr. Lay's battle to gain entry into the Global Casino Championship, writing as part of coverage of a qualifying tournament:

**Tony Lay Moving Up**

Friday, May 19, 2017 5:16 PM PST

Tony Lay is one of those fighting for a seat in the Global Casino Championship, entering this Main Event just 2.5 points below the current cutoff line. The pro from Oklahoma is so far on the right track toward an in-the-money finish, and he's just removed a player from the field.

The player in question moves all in for 13,100 preflop, and Lay puts him at risk on a coin flip.

Lay: 5♣ 5♥
Opponent: A♦ K♦

The board runs out J♠ 3♣ 2♣ 4♥ 8♦, and Lay wins the flip and the pot with his pair of fives.

Tony Lay - 64,000

29. In fact, on March 27, 2017, the Defendant published a WSOPC update on its website which not only publicized Mr. Lay's standing in a qualifying tournament, but which specifically boasted, *inter alia*, "The winner will earn $180,806, a WSOP Circuit ring, and a free entry to the WSOP Global Casino Championship:"

7



03/27/17 09:55:43 AM PST
**Day 3 of Main Event Starts at Noon**

*Daniel Lowery*

After three days of poker, the winner of the Main Event will be crowned tonight. A starting field of 574 has been reduced to the final nine. Daniel Lowery (pictured) leads the way with 2,120,000 in chips.

The winner will earn $180,806, a WSOP Circuit ring, and a free entry to the WSOP Global Casino Championship.

The final table will be live streamed by the Hard Rock Tulsa, so watch at this link or keep an eye on updates here as determine the Circuit's next Main Event champion.

Here are the seating assignments and chip counts to start Day 3:

1 - Hank Sitton - 1,060,000
2 - Jose Anaya - 780,000
3 - Collin Grubaugh - 980,000
4 - Daniel Lowery - 2,120,000
5 - Garry Simms - 1,690,000
6 - Phuong Phan - 190,000
7 - Will Berry - 1,620,000
8 - David Brown - 2,100,000
9 - Tony Lay - 920,000

30. Further, on March 24, 2017, the Defendant actually posted multiple updates to the WSOP website, with one update advertising, *inter alia*, "The winner will receive a free seat into this year's WSOP Global Casino Championship…" and an update barely two and a half hours later highlighting Mr. Lay's efforts to achieve the advertised goal, with a picture of Mr. Lay playing poker:

8

03/24/17 06:55:49 AM PST
## Main Event Starts at 11:00 AM



After a week of preliminary events, it's finally time for the Main Event here at the Hard Rock Tulsa. This is the first Circuit stop here at the Hard Rock, so there is no defending champion, and the winner will become the first-ever Circuit Main Event champion here. The winner will receive a free seat into this year's WSOP Global Casino Championship, as well as a gold Circuit ring and the lion's share of the prize money.

Here's the key info for the event:

- Players start with 20,000 in tournament chips.
- There are two starting flights: today at 11:00 AM and Saturday at 11:00 AM.
- This is a re-entry event, and players are allowed up to two bullets per flight.
- Late-registration and re-entry are open until the start of Level 13 (roughly 8:45 p.m.)
- Day 1 is scheduled for 15 Levels.
- Levels today are 40 minutes each. On Day 2 they increase to 60 minutes.
- There will be a 90-minute dinner break after Level 9, and shorter breaks every two hours of play.
- Players who advance to Day 2 will return at noon on Sunday.
- Click here for a full structure sheet.

03/24/17 09:35:02 AM PST
**Tony Lay Gets There Unconventionally**



Tony Lay

Tony Lay raises to 150 from early position and the player in the cutoff calls. Jackson White three-bets to 400 on the button, the player in the big blind calls, Lay calls, and the cutoff calls as well.

They are four-handed to a flop of J♣ 9♥ 8♥ and all three players check to White, who bets 700. The big blind folds, Lay calls, and the cutoff check-raises to 3,000. White folds and Lay calls.

The turn is the 5♣ and Lay checks. The cutoff bets 3,000 and Lay calls. The 5♦ comes on the river and both players check. The cutoff shows Q♦ J♣ and Lay wins the pot with 7♥ 5♥, good for trip fives.

"That's not the way you thought you were going to win that hand," said another player at the table to Lay.

Tony Lay - 27,000

31. To be sure, the Defendant not only advertised the subject promotion in a broad and pervasive manner aimed at reaching poker players like Mr. Lay and inducing them to partake therein, but the Defendant went so far as to use Mr. Lay's likeness in connection with the promotion, to advertise Mr. Lay's progress partaking in the promotion, and to ensure the poker public at large – inclusive of Mr. Lay – knew exactly what he had to do to qualify for the Global Casino Championship and exactly what he would be entitled to receive upon such qualification.

### General Allegations: Mr. Lay's Sports Gambling

32. On March 20, 2013, a federal grand jury sitting in the Western District of Oklahoma returned an indictment charging fifty seven (57) individuals, including Mr. Lay, with violating nine (9) separate sections of the United States Code (the "Federal Charges").

33. The Federal Charges alleged Mr. Lay to be acting as a "bookie" and a "bagman" in connection with the operations of an illegal sports gambling racket.

34. The Federal Charges do not allege Mr. Lay to have engaged in any acts of violence, intimidation, or physicality, nor do they allege Mr. Lay to have committed any freestanding crimes of moral turpitude in the nature of extortion or fraud.

35. On April 13, 2015, Mr. Lay petitioned the United States District Court for the Western District of Oklahoma for leave to enter a plea of guilty to the first count of a superseding indictment stemming from the Federal Charges.

36. Pursuant to a plea agreement with the United States, Mr. Lay thereafter entered a plea of guilty to charges that he engaged in a racketeering conspiracy in contravention of Section 1962(d) of Title 18 of the United States Code.

37. On January 7, 2016, a judge of the United States District Court for the Western District of Oklahoma sentenced Mr. Lay to a period of probation of one (1) year, the performance of one hundred four (104) hours of community service while on probation, and the payment of a special assessment of One Hundred Dollars and No Cents ($100.00) (the "Sentence").

38. Mr. Lay completed the sentence without incident or controversy and is no longer on probation.

### General Allegations: Mr. Lay's Poker Play

39. Mr. Lay is now a professional poker player who derives a significant portion of his income from participation in poker tournaments throughout the United States.

40. No portion of the Sentence prohibited Mr. Lay from participating in legal gaming activities, and as a convicted felon he found it far easier to derive an income in the relatively

11

nonjudgmental world of professional gaming than to earn monies through other employment channels where his criminal record could create appreciable barriers to entry and promotion.

41. It is, and at all times relevant has been, widely known in the poker community that Mr. Lay is a convicted felon due to his involvement in an illegal sports betting racket.

42. Specifically, Jack Effel, the Vice President and Tournament Director of the World Series of Poker since 2007, has known, at all times relevant, that Mr. Lay is a convicted felon due to his involvement in an illegal sports betting racket.

43. As a professional poker player, Mr. Lay has made his living playing events throughout the United States during the past several years, and has never encountered any issues related to his prior and wholly unrelated criminal conduct, except as set forth herein.

### General Allegations: Mr. Lay's WSOPC Play

44. As a professional poker player, Mr. Lay elected to partake in multiple WSOPC events in the early months of 2016.

45. As highlighted by the aforementioned promotional materials of the Defendant, Mr. Lay proved successful at winning monies in some of the WSOPC events in which he participated and, thus, began to accumulate points toward entry in the Global Casino Championship.

46. Based on the accumulation of points and the implied value of an invitation to the Global Casino Championship, Mr. Lay continued to patronize WSOPC events, foregoing the opportunity to play poker on other tournament poker tours, and foregoing the opportunity to enjoy the benefits of promotions run by competing poker tours.

47. One of the WSOPC tour stops patronized by Mr. Lay was conducted at the Horseshoe Casino (the "Horseshoe") in Baltimore, Maryland, during the months of April 2017

and May 2017.

48. The Horseshoe is owned and operated by Caesars, either directly or through one or more intermediary or "holding" companies.

49. The WSOPC is owned and operated by Caesars, either directly or through one or more intermediary or "holding" companies.

50. Through his play at the Horseshoe and elsewhere, Mr. Lay accumulated a sufficient number of points to be invited to the Global Casino Championship in August 2017.

51. After receiving his invitation to the Global Casino Championship, Mr. Lay was again contacted by Caesars and notified that he was being banned from entry on all Caesars properties across the United States of America (the "Banning Notice").

52. The Banning Notice prohibits Mr. Lay from entry on Caesars property grounds and, by extension, prohibits him from participation in the Global Casino Championship, an event conducted by Caesars at a property owned and operated by Caesars.

53. The Banning Notice does not allege Mr. Lay to have engaged in any offensive, problematic, dangerous, alarming, or otherwise noteworthy behavior while on the grounds of any Caesars property or while participating in any WSOPC event but, rather, is based solely on Mr. Lay's previous Federal Charges.

54. The Banning Notice is rooted solely in actions of Mr. Lay more than four years in the past, all of which have been well known in the gaming community, specifically known to the express disclosed agent of the Defendant charged with operation of the WSOPC, and widely publicized in the media – at all times relevant.

55. By issuing the Banning Notice to Mr. Lay, Caesars was able to avoid the expenditure of monies on his trip to the Global Casino Championship, and was also able to avoid

having to pay into the prize pool of the Global Casino Championship the sum of Ten Thousand Dollars and No Cents ($10,000.00) as and for Mr. Lay's participation therein.

### General Allegations: Previous Suit

56. Mr. Lay previously brought suit against Caesars Enterprise Services, LLC ("CES"), in this Honorable Court, for the tortious conduct complained of herein (the "Original Suit").

57. CES removed the Original Suit to the United States District Court for the District of Maryland and therein argued, *inter alia*, that it was not CES that had banned Mr. Lay from playing poker but, rather, Caesars.

58. CES secured dismissal of the Original Suit in the United States District Court for the District of Maryland, with that Honorable Court noting, *inter alia*, Mr. Lay had sued "an improper entity" in CES and failed to "add an entity that actually prevented his participation in the tournament" in Caesars.

59. Caesars was never a party to the Original Suit, and the Original Suit never proceeded to discovery, much less any adjudication of Mr. Lay's claims on the merits.

60. Following dismissal of the Original Suit, Mr. Lay's counsel has assessed the propriety of bringing this suit against Caesars – an entity that is not registered to conduct business in Maryland, but which has been suggested as the proper defendant herein by the United States District Court for the District of Maryland – and determined such to be proper based on CES' previous litigation posture and the judicial ruling made based on that posture.

### General Allegations: Damages

61. Notwithstanding the various causes of action enumerated below, each of which has a freestanding *ad damnum* clause, the compensatory and punitive damages sought by Mr.

Lay herein are intended to be overlapping and not cumulative, such that he seeks compensatory and punitive damages in a sum total not to exceed Seventy Five Thousand Dollars and No Cents ($75,000.00) exclusive of interest and costs.

### Count One
### Fraud

62. Mr. Lay repeats and re-alleges each and every foregoing paragraph of this Complaint, as though fully set forth herein.

63. Caesars represented to the public at large – including Mr. Lay – that any person accumulating a sufficient number of points on the WSOPC tour would be invited to play in the Global Casino Championship, for free, with travel and expenses paid for by Caesars.

64. This representation was made for the express purpose of inducing Mr. Lay and other members of the public to patronize WSOPC events in lieu of competing poker tour events, and for the further purpose of inducing Mr. Lay and other members of the public to patronize the Caesars properties – including the Horseshoe, in Baltimore City, Maryland – at which many WSOPC events are held.

65. Mr. Lay relied on this representation in electing to play in WSOPC events in lieu of those held by competing poker tours, in electing to travel to various locations throughout the United States – including Baltimore City, Maryland – to play in such events, and in patronizing the various properties at which such events were conducted.

66. The representation proved to be false, as Mr. Lay was ultimately not permitted to participate in the Global Casino Championship because Caesars instead issued to him the Banning Notice.

67. Mr. Lay has suffered compensable injury as a result of this fraudulent conduct, as he has been deprived of the enjoyment of a Global Casino Championship entry package valued

in excess of Ten Thousand Dollars and No Cents ($10,000.00).

WHEREFORE, Mr. Lay respectfully prays this Honorable Court (i) enter judgment in his favor, and against Caesars, as and for actual damages together with punitive damages, for a sum not to exceed Seventy Five Thousand Dollars and No Cents ($75,000.00) in the aggregate; and (ii) afford such other and further relief as may be just and proper.

### Count Two
### Negligent Misrepresentation

68. Mr. Lay repeats and re-alleges each and every foregoing paragraph of this Complaint, as though fully set forth herein.

69. Caesars, as the entity in control of both the WSOPC and the Horseshoe, owed Mr. Lay – a patron of each – a duty of good faith and fair dealing.

70. Caesars represented to the public at large – including Mr. Lay – that any person accumulating a sufficient number of points on the WSOPC tour would be invited to play in the Global Casino Championship, for free, with travel and expenses paid for by Caesars.

71. Caesars intended this statement to be relied upon by Mr. Lay and other members of the public, as the statement was in the nature of an advertising promotion meant to induce Mr. Lay and others into patronizing the WSOPC and various Caesars properties.

72. Mr. Lay relied on this representation in electing to play in WSOPC events in lieu of those held by competing poker tours, in electing to travel to various locations throughout the United States – including Baltimore City, Maryland – to play in such events, and in patronizing the various properties at which such events were conducted.

73. Mr. Lay has suffered compensable injury as a result of this misrepresentation, as he has been deprived of the enjoyment of a Global Casino Championship entry package valued in excess of Ten Thousand Dollars and No Cents ($10,000.00).

WHEREFORE, Mr. Lay respectfully prays this Honorable Court (i) enter judgment in his favor, and against Caesars, in the amount of Twenty Five Thousand Dollars and No Cents ($25,000.00); and (ii) afford such other and further relief as may be just and proper.

### Count Three
### Negligence Per Se

74.   Mr. Lay repeats and re-alleges each and every foregoing paragraph of this Complaint, as though fully set forth herein.

75.   Caesars has a duty to not engage in false advertising, in contravention of Section 11-703 of the Commercial Law Article, within the State of Maryland.

76.   Caesars' rendering of the aforementioned false representations constitute a violation of Section 11-703 of the Commercial Law Article.

77.   Mr. Lay, as a consumer who engaged in consumer conduct within the State of Maryland, is among the class of individuals intended to be protected by the mandate of Section 11-703 of the Commercial Law Article.

WHEREFORE, Mr. Lay respectfully prays this Honorable Court (i) enter judgment in his favor, and against Caesars, in the amount of Twenty Five Thousand Dollars and No Cents ($25,000.00); and (ii) afford such other and further relief as may be just and proper.

### Count Four
### Unfair and Deceptive Trade Practices

78.   Mr. Lay repeats and re-alleges each and every foregoing paragraph of this Complaint, as though fully set forth herein.

79.   Caesars representation to Mr. Lay, as a member of the public at large, that he would be able to participate in the Global Casino Championship if he accumulated the requisite number of points, constituted an unfair and deceptive trade practice pursuant to the definitional provisions of Sections 13-301(1), 13-301(3), 13-301(5)(i), 13-301(9)(i), 13-301(9)(iii), and 13-

301(14)(i) – through its incorporation of Section 11-703 – of the Commercial Law Article.

WHEREFORE, Mr. Lay respectfully prays this Honorable Court (i) enter judgment in his favor, and against Caesars, in the amount of Twenty Five Thousand Dollars and No Cents ($25,000.00); (ii) award him his reasonable attorneys' fees incurred in connection with this action, pursuant to the allowance of Section 13-408 of the Commercial Law Article; and (ii) afford such other and further relief as may be just and proper.

Respectfully submitted,

THE VERSTANDIG LAW FIRM, LLC,

/s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: 301-444-4600
Facsimile: 301-444-4600
E-mail: mac@mbvesq.com
*Counsel for the Plaintiff*

## JURY DEMAND

Pursuant to, and in conformity with, Maryland Rule 2-325, Mr. Lay demands a trial by jury on all issues so triable.

/s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.